# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

INGRAM BARGE COMPANY,      )
                                  )

Plaintiff,                 )
                                  )    **Case No. 3:10-cv-00110**

v.                     )    **Judge Aleta A. Trauger**
                                  )

CENTURY ALUMINUM OF WEST    )
VIRGINIA, INC.,             )
                                  )

       Defendant.        )

## MEMORANDUM

Pending before the court are defendant Century Aluminum of West Virginia, Inc.'s ("Century") Motion for Summary Judgment (Docket No. 62), plaintiff Ingram Barge Company's ("Ingram Barge") Cross-Motion for Summary Judgment (Docket No. 72), and Century's Motion to Strike the Affidavit of Maria Conatser (Docket No. 81) that Ingram Barge had filed in support of its Cross-Motion for Summary Judgment.[1]  For the reasons stated herein, Century's Motion

---

[1] In support of its Motion for Summary Judgment, Century filed a Memorandum of Law (Docket No. 63), a Concise Statement of Material Facts as to Which There is No Genuine Issue for Trial (Docket No. 64) ("Century's SUF"), and exhibits in support of thereof (Docket No. 65). In response, Ingram Barge filed a Cross-Motion for Summary Judgment and Response in Opposition to Defendants' Motion for Summary Judgment (Docket No. 72), a supporting Memorandum of Law (Docket No. 73), evidentiary materials in support thereof (Docket No. 74) (including the Conatser Affidavit), a sealed Statement of Undisputed Material Facts in Support of Its Cross-Motion for Summary Judgment (Docket No. 75) ("Ingram Barge's SUF"), and a Response to Century's SUF (Docket No. 76).  In response thereto, Century filed (1) a Motion to Strike the Conatser Affidavit (Docket No. 81), to which Ingram Barge filed a Response in opposition (Docket No. 83), and Century filed a Reply (Docket No. 95), and (2) a Reply in support of its Motion for Summary Judgment and in response to Ingram's Barge Cross-Motion for Summary Judgment (Docket No. 87), along with a Response to Ingram Barge's SUF (Docket No. 89).  Finally, Ingram Barge filed a Reply in support of its Cross-Motion for Summary Judgment (Docket No. 96).

for Summary Judgment will be denied, Ingram Barge's Motion for Summary Judgment will be granted as to liability, and the matter will be referred to the Magistrate Judge for a hearing to determine the appropriate amount of Ingram Barge's damages.

## BACKGROUND[2]

### I.    Overview

Century is a corporation that operated an aluminum smelter in Ravenswood, West Virginia (hereinafter, the "smelter"), at which Century utilized aluminum and calcined coke for production.  Ingram Barge is a corporation that transports materials by barge.  On September 28, 2006, Ingram Barge and Century entered into two agreements related to the transportation of materials to the smelter through December 31, 2010, one relating to the transportation of alumina (Docket No. 85, Second Am. Compl.[3], Ex. 1 ("Alumina Agreement")), the other relating to the transportation of calcined coke (*id.*, Ex. 2 ("Coke Agreement")) (collectively, "Agreements"). The Alumina Agreement related to the time period from January 1, 2007 through December 31, 2010 (*i.e.*, a four-year period), while the Coke Agreement related to the time period from January 1, 2008 through December 31, 2010 (*i.e.*, a three-year period).

---

[2]The court has considered Century's SUF, Ingram Barge's SUF, and the parties' respective Responses thereto.  Unless otherwise noted, this background section reflects the undisputed facts.  As discussed herein at pp. 26-27, the court makes its findings without reference to the Conatser Affidavit, which Century has moved to strike.  Therefore, the court will not summarize the substance of the Conatser Affidavit in this section.

[3]In conjunction with filing its Cross-Motion for Summary Judgment, Ingram Barge sought leave of court to file a Second Amended Complaint (Docket No. 71), which the court granted as unopposed (Docket No. 84).  Ingram represented that, in the Second Amended Complaint, it revised the total amount of damages it was seeking downward to reflect its correction of a previous calculation error.  The Second Amended Complaint is in the record at Docket No. 85.  Other than the revised damages demand, the Second Amended Complaint does not differ from the First Amended Complaint in any relevant respect.

Between January 1, 2007 and early 2009, the parties performed under the Agreements: Century shipped materials[4] for use at the smelter utilizing Ingram Barge and, pursuant to freight rates specified in the Agreements, paid Ingram Barge for carrying the materials. However, in or about March 2009, after shipping only a handful of loads that year, Century informed Ingram Barge that it was curtailing production operations at the smelter, apparently due to deteriorating economic conditions.[5] Accordingly, Century stated that it no longer needed any alumina and calcined coke at the smelter, would no longer need Ingram Barge's barging services for that purpose, and accordingly would make no further payments.

Ingram Barge, however, believed that it was entitled to be paid for the balance of material that it would have shipped through December 31, 2010, had the smelter remained fully operational. After Century refused to make any further payments – for material that it would not be shipping – Ingram Barge filed the instant lawsuit, seeking recovery of its lost profits.

The parties' central dispute concerns whether the Agreements constituted either (a) traditional bilateral contracts for services, in which Century agreed to ship a guaranteed volume of material using Ingram Barge through December 31, 2010, or (b) so-called "requirements

---

[4]The Agreements refer to Century as the "shipper" and Ingram Barge as the "carrier." Thus, Century "shipped" the alumina and coke, which Ingram Barge "carried" or transported.

[5]At a "curtailed" smelting facility, the owner/operator continues to perform necessary maintenance utilizing a skeleton crew, with the expectation of restarting the facility under appropriate economic conditions. Although not specifically stated by the parties in their SUFs, it appears that the facility was curtailed by March 17, 2009. (*See* Alumina Agreement, Amendment IV) (referencing reconsignment of 19 barges by that date); Docket No. 74, Ex. 1, States Rule 30(b)(6) Dep. at 111:10-15.) At any rate, the record contains a letter dated April 14, 2009 – approximately one month after reconsignment of the 19 barges – in which Ingram Barge stated its understanding that Century had ceased shipping any materials under the Agreements. (*See* Second Am. Compl., Ex. 3.)

contracts," pursuant to which Century agreed to ship only the amount of alumina and coke that it required for its production operations at the smelter, without any guaranteed shipment volume. Century also contends that, if the contracts are not construed as requirements contracts, they are unenforceable and/or that Ingram Barge has not shown that it actually suffered any damages.

II.     **Relevant Terms of the Agreements**[6]

Both Agreements are similar in most relevant respects. Each Agreement contains a "Part I," a "Part II," and an "Appendix I" ("Appendix"), each of which is incorporated by reference into the Agreement. Part I of each Agreement recites the identities of the contracting parties (Ingram Barge and Century) and states as follows:

> This Agreement is made as of September 28, 2006, by and between Carrier [Ingram Barge] and Shipper [Century] (as identified above) and is for the transportation of dry cargo by barge under the terms and conditions of Parts I and II as contained in this Agreement. The provisions of Part I and Part II shall both be accorded equal weight and shall be construed together in ascertaining the meaning of this Agreement.

In each Agreement, the page with this statement contains the signatures of Daria A. Schwartz, Ingram Barge's Manager of Dry Cargo Sales, and Scott J. States, the Corporate Director of Procurement and Logistics for Century's parent company, who signed on behalf of Century.

Part I of each Agreement contains 14 numbered terms, some of which incorporate information contained within the attached Appendix. For example, Part I of the Alumina

---

[6]The parties filed materials in support of the Motion for Summary Judgment and the Cross-Motion for Summary Judgment under seal to preserve the confidentiality of certain materials produced in discovery by Ingram Barge, including Ingram Barge's system-wide financial information. (*See, e.g.*, Docket No. 59). However, Ingram Barge did not file its Complaints under seal. Thus, the terms of the Agreements, which were attached to each iteration of the Complaint, are already a matter of public record and do not present confidentiality concerns.

Agreement contains terms specifying, *inter alia*, the contractual duration ("January 1, 2007 through December 31, 2010"), the type of barge that Ingram Barge would use, the nature of the cargo to be shipped/carried, the value of the cargo, the number of net tons to be shipped/carried ("360,000 net tons per year +/- 10%"), the origin point(s) for shipments ("Lower Mississippi River Mileposts 85 through 235"), the destination(s) of the shipments (by reference to the Appendix), base freight rates (by reference to the Appendix), a minimum amount to be shipped/carried on each barge, a fuel cost protection provision (by reference to the Appendix), a cleaning allowance imposed on Ingram Barge (by reference to Part II, ¶ 31), and other "special provisions" stated in the Appendix. (Alumina Agreement, Part I, ¶¶ 1-8 and 11-14.) Part I of the Coke Agreement contains substantially similar provisions, except for differences in the number of origin and destination points with associated rates (discussed further herein) and a different quantity term: "77,000 net tons per year +/- 10%." (Coke Agreement, Part I ¶¶ 5 (quantity term) and 8 (base freight rates by incorporation of the associated Appendix).)

The Appendix to the Alumina Agreement, which Schwartz (on behalf of Ingram Barge) and States (on behalf Century) both signed, contains a list of two "primary" routes and multiple "alternate" routes, as follows:

- Alumina Agreement: The "primary routes" include two routes: (1) transport from the Lower Mississippi River Mileposts 85 through 235 to Ravenswood, West Virginia (*i.e.* the location of the smelter) with an associated base rate of $14.28 per net ton; and (2) transport from Point Comfort, Texas to Ravenswood, West Virginia (where the smelter was located) at a base rate of $33.00 per ton, with a proviso that there would be a "maximum of 4 barges per month [from] Point Comfort." Furthermore, with respect to both "primary routes," the list states an "Annual Tonnage" of "360,000." The "alternate routes" reflect a combined 14 routes from four origin points (including Ravenswood and the two primary origin points) to 6 different destination points, each with an associated base rate ranging from $7.88 to $37.43 per net ton.

5

- Coke Agreement: The "primary routes" include four routes beginning in Louisiana and ending at Ravenswood, all of which are subject to a combined "Annual Tonnage" of "77,000 +/- 10%." The base rates for three of the routes are identical ($14.28 per net ton); the fourth rate is about 50% lower ($6.16 per net ton). The "alternate" routes include a combined 10 different routes, from four origin points to one of 6 destination points, each with an associated base rate ranging from $7.88 to $16.89 per net ton.

Century requested the inclusion of the "alternate" routes, pursuant to its standard procedure to provide alternatives to the primary route(s) in case of emergencies or *force majeure*.

Part II of each Agreement contains 40 paragraphs of additional terms (numbered 15 to 55). These terms include, *inter alia*: terms relating to the calculation of freight charges (¶ 18); the circumstances under which Ingram Barge could transfer cargo and/or deviate from its original route (¶¶ 21 and 25); Ingram Barge's obligation to maintain cargo insurance and other forms of insurance at its own expense (¶¶ 17 and 45(a)), as well as Century's obligation to maintain certain forms of insurance (¶ 45(a)); Century's obligation to pay freight charges once loaded at the origin point (¶ 26)); a ratability provision, obligating Century to ship "in approximately equal monthly increments and approximately equal weekly increments within each month" (¶ 30); Ingram Barge's obligation to pay cleaning costs up to $500 per barge to remove cargo left in the hopper by Century (¶ 31); Century's obligation to pay additional charges if the loading date or designated origin is changed on less than five working days' notice (¶ 37); Ingram Barge's obligation to tender barges that are "in suitable condition to receive the intended cargo" (¶ 38); indemnity provisions, pursuant to which (a) Ingram Barge would indemnify Century for any losses due to its own negligence or willful misconduct, and (b) Century would similarly indemnify Ingram Barge for any losses due to Century's negligence or

willful misconduct (¶ 41); and, subject to certain notification requirements, a provision excusing either party from performing its obligations due to *force majeure*, such as an act of God, an explosion, or a labor dispute (¶ 45). Each Agreement also contains an integration clause, which states, in relevant part, that "[t]his Agreement, together with the appendices hereto, sets forth the entire understanding between the parties hereto as to the subject matter and no amendment hereto shall be valid unless made in writing and duly signed by the parties hereto." (*Id.* ¶ 55.) Schwartz and States separately initialed each page of Part II.

The Alumina Agreement also contains four Amendments.[7] Amendment I, dated June 27, 2007, provided that, for two specified load date ranges in July 2007, Ingram Barge could use lift covered barges at a specified base rate, rather than roll covered barges as specified in Part I. Amendment II, dated October 19, 2007, provided a base rate per ton for shipments that Ingram Barge carried in lift covered barges along the primary route between the Lower Mississippi River mileposts and Ravenswood. Amendment III, dated October 24, 2008, revised Amendment II to include the destinations referenced in Appendix I and provided a specified base rate reduction in the event lift covered barges were used. Amendment IV, dated March 17, 2009, related to reconsignment of 19 barges, presumably after Ingram Barge had ascertained that Century had ceased operations at the smelter. The Coke Agreement does not contain any amendments.

The Agreements do not state that they are "requirements contracts," nor do they contain the terms "necessary," "requirement," "more or less," "as needed," or any similar language.

---

[7]In the copies of the Alumina Agreement filed with the court, the Amendments are signed by Ingram Barge (Schwartz) but not Century. Nevertheless, the parties do not dispute the validity of these Amendments.

Furthermore, the Agreements do not contain any exclusivity provisions obligating Century to use only Ingram Barge to transport the alumina and coke utilized at the smelter during the contractual period.

### III.   Parties' Negotiations, Expectations, and Actual Performance

The parties engaged in bilateral negotiations before signing the Agreements. Bill Brookhart, Century's Purchasing Manager, negotiated directly with Schwartz concerning the Agreements. During the course of the negotiations, Brookhart consulted with States, who ultimately signed the Agreements. The parties apparently began working from a form agreement prepared by Ingram Barge, to which they added specific terms, as reflected in Part I and the Appendix (such as the rates, quantity, and routes). Furthermore, as finalized, Part II of Agreement omitted certain paragraphs otherwise contained within Ingram Barge's form agreements.[8] States also consulted with in-house legal counsel before signing the Agreements. (*See* Docket No. 74, Ex. 1, States Rule 30(b)(6) Dep. at 116:11-16.)

The parties have not produced any documents outside the Agreements referencing an intent to enter into a requirements contract. However, Century contends that deposition testimony from representatives of Ingram Barge and Century reflect such an intent. (*See, e.g.*, Docket No. 65, Ex. 7, Schwartz Dep. at 9:16-11:8; 22:9-23:1; Ex. 5, Martin Dep. at 98:20-100:12; Ex. 6, Scott States Rule 30(b)(6) Dep. at 33:15-22 (stating his belief that "we have the right to call for someone to ship anywhere from zero to infinity").)

---

[8]From the record, it is not clear at what point these paragraphs were omitted from the draft Agreements, or what terms they contained. At any rate, the final versions of each Agreement, which both parties signed and/or initialed on each page, omitted several paragraphs as "Intentionally deleted." (*See, e.g.*, Alumina Agreement, ¶¶ 29, 39, 43, 44 (each stating that it was "Intentionally deleted").)

In 2007 and 2008, Century in fact utilized Ingram Barge to ship tonnages of alumina within 10% of the 360,000 net tons quantity term listed in the Alumina Agreement at ¶ 5 and in the associated Appendix, and shipped at least a majority of that alumina along the "primary" route from the Lower Mississippi River to Ravenswood. Similarly, in 2008, Century in fact utilized Ingram Barge to ship within 10% of the 77,000 net tons quantity term listed in the Coke Agreement at ¶ 5 and in the associated Appendix. Again, Ingram Barge shipped at least a majority of the coke along one of the primary routes. It appears that the amounts shipped in 2007 and 2008 in fact met the smelter's production needs and that Century did not utilize any company other than Ingram Barge to ship alumina and coke to the facility. In 2009, Century shipped only a handful of loads of alumina and coke to the smelter before curtailing the smelter's operations.

## SUMMARY JUDGMENT STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2011). At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine issue of material fact. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its burden by showing that there is an absence of evidence to support the non-moving party's case. *Id.* (citing *Celotex*, 477 U.S. at 325). "When the moving party has carried this burden, 'its opponent must do more than simply

show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).)  The non-moving party also may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial.  *Id.*

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'"  *Moldowan*, 578 F.3d at 374 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  "In evaluating the evidence, the court must draw all inferences in the light most favorable to the nonmoving party."  *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587).  But "[t]he  mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient," *Moldowan*, 578 F.3d at 374 (quoting *Anderson*, 477 U.S. at 252), and the non-movant's proof must be more than "merely colorable."  *Anderson*, 477 U.S. at 249.  An issue of fact is "genuine" only if the record taken as a whole could lead a rational trier of fact to find for the non-moving party.  *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587).

## <u>ANALYSIS</u>

### I.    <u>The Parties' Positions</u>

The parties dispute whether the Agreements constituted enforceable bilateral contracts with a guaranteed volume or, by contrast, requirements contracts with no guaranteed volume.  Furthermore, Century argues that, if the court were to construe the contracts as bilateral contracts for a fixed quantity, then (1) the Agreements are unenforceable as illusory and/or not supported

by adequate consideration; and (2) Ingram Barge has not established that it suffered any damages.  On the other hand, Century argues that, if the court construes the Agreements as requirements contracts (as it believes the court should), then the Agreements are enforceable.

## II.    The Nature of the Agreements

### A.    Applicable Law

Both Agreements specify that they are to be governed by the general maritime law of the United States, or, to the extent any matter is not covered thereby, by the laws of the State of Tennessee.  (*See* Agreements, Part II at ¶ 55(D).)  Here, with respect to general principles of contractual interpretation, the parties rely on Tennessee law, which the court interprets as reflecting their agreement that Tennessee law, not maritime law, governs the issues presented by the parties.

"In resolving disputes concerning contract interpretation, [the court's] task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language."  *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 889-90 (Tenn. 2002) (internal quotation omitted).  "This determination of the intention of the parties is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue for a jury to decide."  *Id.* at 890 (citing 5 Joseph M. Perillo, *Corbin on Contracts*, § 24.30 (rev. ed. 1998) and *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001)); *see also German v. Ford*, 300 S.W.3d 692, 701-702 (Tenn. Ct. App. 2009) ("The interpretation of a contract and the ascertainment of the parties' intentions relating to the contract are . . . questions of law.")  Furthermore:

> A court's initial task in construing a contract is to determine whether the language of the contract is ambiguous. Once found to be ambiguous, a court applies established rules of construction to determine the parties' intent. Only if ambiguity remains after the court applies the pertinent rules of construction does [the legal meaning] become a question of fact appropriate for a jury.

*Planters*, 78 S.W.3d at 890.

"The intent of the parties is presumed to be that specifically expressed in the body of the contract." *Id.* If clear and unambiguous, the literal meaning of the language controls the outcome. *Id.*; *see also Petschonek v. Catholic Diocese of Memphis*, No. W2011-02216-COA-R9-CV, 2012 WL 1868212, at *9 (Tenn. Ct. App. May 23, 2012) ("When the language of the contract is plain and unambiguous, courts determine the intentions of the parties from the four corners of the contract, enforcing and interpreting it as written.") (citing *Int'l Flight Ctr. v. City of Murfreesboro*, 45 S.W.3d 565, 570 (Tenn. Ct. App. 2000)).

## B.     Legal Authority Concerning Requirements Contracts

With respect to whether the Agreements constitute requirements contracts, the parties rely almost exclusively on authority from outside Tennessee. Indeed, with the exception of a single Tennessee Supreme Court case of limited relevance cited by Century (as discussed further herein) the parties have not cited to any pertinent Tennessee authority concerning requirements contracts. *See John P. Saad & Sons, Inc. v. Nashville Thermal Transfer Corp.*, 715 S.W.2d 41, 43 n.3 (Tenn. 1986).[9] With respect to the treatises and non-Tennessee cases cited by the parties

---

[9]The Tennessee Uniform Commercial Code includes a provision relating to requirements contracts, as follows:

> (1) A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimated or in the absence of a stated estimate to any normal or otherwise

here, the parties do not appear to dispute that those authorities are potentially persuasive – they merely dispute whether the holdings in particular cases are applicable to or distinguishable from the circumstances presented here.[10]  Accordingly, the court will consider the persuasive weight of these cases, under the assumption that the Tennessee Supreme Court would do the same.

A requirements contract is generally defined as a contract in which the seller promises to supply all the specific goods or services which the buyer may need during a certain period at an agreed price, in exchange for the promise of the buyer to obtain his required goods or services exclusively from the seller.  *Propane Indus., Inc. v. Gen. Motors Corp.*, 429 F. Supp. 214, 219 (W.D. Mo. 1977); *Tenn. Valley Auth. v. Imperial Prof'l Coatings*, 599 F. Supp. 436, 438 (E.D. Tenn. 1984) (applying federal law) ("A requirements contract is a contract in which the purchaser agrees to buy all of its needs of a specified material from a particular supplier, and the supplier agrees, in turn, to fill all of the purchaser's needs during the period of the contract.") (internal quotation omitted).  The purpose of a requirements contract is to give the buyer an assured source of supply over an extended period of time without obliging him to purchase a

---

comparable prior output may be tendered or demanded.

(2) A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes [,] unless otherwise agreed [,] an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale.

*See* Tenn. Code Ann. § 47-2-306 (2012).  Although the UCC does not govern this case, which concerns contracts for services, the UCC's terms are broadly consistent with the features of requirements contracts discussed in the other authorities referenced by the parties here.

[10]Indeed, as at least one other district court has noted, it appears that the standards for a requirements contract are generally consistent across jurisdictions.  *See Ben-Trei Overseas, L.L.C. v. Gerdau Ameristeel, US, Inc.* No. 09-CV-153-TCK-TLW, 2010 WL 1410984, at *8 n.10 (N.D. Okla. Mar. 31, 2010) (reaching same conclusion).

specified quantity, thus enabling him to meet the fluctuating needs of his business. *Tenn. Valley Auth.*, 599 F. Supp. at 438-39. In light of this purpose, courts have generally permitted a buyer to cut back or eliminate his orders if there is a *bona fide* decrease in needs. *Id.* By the same token, in a requirements contract, the supplier locks in a customer, knowing, however, that the customer's needs are variable and uncertain. *See* 2 Corbin on Contracts, Rev. Ed. (1995), § 6.5. "As in other contexts, the promise to take one's requirements or to supply requirements need not be express; it may be implied." *Id.* Thus, "it should be implied where the claimant reasonably understood that such a commitment had been made although the writing, though careless, or perhaps [through] overly skillful drafting, fails to state it in so many words." *Id.*

### C. Application

#### 1. Whether the Agreements Constitute Requirements Contracts

Century argues that, interpreting the Agreements as a whole, the court should construe them as requirements contracts. In particular, they argue that the quantity term set forth in ¶ 5 of each Agreement, which includes a "+/- 10%" after a fixed quantity amount, reflects an estimate, rather than a specific quantity term. They argue that the inclusion of the "+/- 10%" term, along with other contractual terms – such as the ratability provision, the requirement that Century pay only for actual tons loaded onto each particular barge, and the inclusion of multiple routes and associated rates – are only consistent with an interpretation of the Agreements as requirements contracts. Furthermore, they argue that, if the court were to construe the Agreements as requirements contracts, they are illusory and lack consideration.

The court does not interpret the quantity terms in the Agreements as ambiguous. The terms "360,000 +/- 10%" and "77,000 +/- 10%" provide a specific and quantifiable range of

product to be shipped under each Agreement: under the Alumina Agreement, between 324,000 and 396,000 net tons of alumina per year; under the Coke Agreement, between 69,300 and 84,700 net tons of coke per year.

With respect to the rates for shipment, the parties simply specified "primary routes" and "alternate routes" along which Ingram Barge could carry the materials. Although, with the exception of the limitation on shipments of alumina from Point Comfort to Ravenswood, the parties did not quantify how much product was to ship along any particular route, the court does not interpret that lack of detail as inconsistent with a contract for a definite quantity term.[11] The inclusion of "primary" routes sufficiently manifested the parties' intent to utilize certain routes in the first instance, reserving others as alternates under appropriate circumstances – as borne out by the parties' actual course of performance.

Moreover, the Agreements do not state that they are requirements contracts and they do not contain any terms indicative of a requirements contract. The contract does not state that the quantity term reflects an "estimate" or the "requirements" or "needs" of the smelter. Furthermore, they contain no exclusivity provision restricting Century's ability to utilize another company to transport material to the smelter. Had the parties intended to include provisions that establish a requirements contract, they could have done so. They did not. Particularly in light of the integration clause, there is no reason for the court to look beyond the plain language of the Agreements.

Although Century may be correct that there are no "magic words" to create a

---

[11]Indeed, the parties included that term at Century's behest and, in practice, Ingram Barge in fact shipped most of the alumina and coke along the primary routes specified in each Agreement.

requirements contract, that does not mean that a contract lacking the typical indicia of a requirements contract should be interpreted as such. The cases cited by Century are all readily distinguishable from the instant case. For example, in the *Tennessee Valley Authority* case, the contract expressly provided as follows: "*This is a requirements contract* for the materials which are required for painting the [designated] areas . . . . The area stated is TVA's *estimated area*, and the quantity is *the theoretical quantity for estimated areas* for the term of this contract; however, TVA *does not guarantee to purchase a maximum or minimum amount*." 499 F. Supp. 435 at 438 (emphases added). Under these circumstances, the court found that the contract was a requirements contract and that the risk of cancellation fell on the seller, because "the contract clearly states that TVA does not guarantee to ship any maximum or minimum amount." Here, by contrast, the Agreements do not state that they are requirements contracts, they do not explicitly reference any "estimate" of Century's needs, they do not contain any disclaimer of a guaranteed purchase quantity, and they *do* reference a quantifiable minimum and maximum quantity term.

The other cases cited by Century are similarly distinguishable. *See, e.g., Brawley v. United States*, 96 U.S. 168 (1877) (finding that contract was a requirements contract, where contract was for "eighty cords of wood, more or less, as shall be determined to be necessary by the post-commander for the regular supply . . . of the troops"); *R.A. Weaver & Assocs., Inc.*, *v. Asphalt Constr., Inc.*, 587 F.2d 1315 (D.C. Cir. 1978) (finding a requirements contract, where contract was for sale of limestone to conform to "specified requirements" and contract provided

that "[a]bove quantities . . . [a]re estimated and will be used to canvass bids but payment will be made for actual quantities of work completed"); *William C. Atwater & Co. v. Terminal Coal Corp.*, 32 F. Supp. 178 (D. Mass. 1940) (finding a requirements contract, where contract quantity term included term "Requirements, not exceeding [x]"); *Maryland Dredging & Contracting Co. v. Coplay Cement Mfg. Co.*, 265 F. 842, 843 (E.D. Pa. 1920) (contract provided for sale of "approximately 225,000 barrels" of cement "[f]or total requirement of Portland cement in the construction of [the dry] dock . . . ."); *Ceredo Mortuary Chapel, Inc. v. United States*, 29 Fed. Cl. 346, 348 (1993) (solicitation for contract provided estimated orders for ambulance trips and strongly implied that only one bidder would be expected to provide estimated services and that the bidder would provide all of the estimated services, thereby establishing the requisite exclusivity).

The lone pertinent Tennessee decision cited by Century, *John P. Saad & Sons v. Nashville Thermal Transfer Corp.*, is also distinguishable. 715 S.W.2d 41 (Tenn. 1986). There, the defendant, which operated an energy production facility, contracted with the plaintiff to supply waste oil for the plant's production needs. The contract provided that the defendant would purchase a minimum of 500,000 gallons or a maximum of 1.2 million gallons of waste oil. The contract also included a provision permitting the defendant to raise the maximum waste oil quantity to 1.5 million gallons upon one year's notice to the plaintiff, intended to be sufficient to permit the plaintiff to "expand its facilities and supply to enable it to supply such changed *maximum use requirements*." (*Id.* at 43) (emphasis added). The court observed that the plaintiff

"had informed the defendant of its need to expand its capacity to meet the demand of *any requirements* in excess of 1.2 million gallons," and that the agreement "was intended by the parties to provide Defendant with a secure source of supply and to permit Plaintiff to expand its facilities in a planned manner." *Id.* (emphasis added). In a footnote, the court simply "observe[d] that this contract is a requirements contract within the meaning of the [Uniform Commercial Code]," *id.* at 43 n.3, a point that apparently was not in dispute. Although the contract at issue in *John P. Saad & Sons* included a minimum and a maximum quantity term, the contract plainly incorporated language indicating that both the wide range between the minimum/maximum quantity terms and the clause providing for upward amendment of that maximum quantity were intended to permit the supplier to meet the defendant's "*requirements*" for the production facility. Furthermore, unlike here, the parties did not dispute that they intended their contract to be a requirements contract.

Century's position that it could have shipped "from zero to infinity tons" of alumina and calcined coke (*see* Docket No. 65, Ex. 6, States Rule 30(b)(6) Dep. at 33:18-22), would require the court to (1) ignore the "+/- 10%" term, thereby nullifying an express term in the Agreements; and (2) add language to the Agreements that contradicts language contained therein. The scant parol evidence – to the extent it is even relevant, given the lack of ambiguity – does not persuade the court that it should rewrite the contract in such a manner. At any rate, even if Century had harbored a subjective intent that the Agreements were to be requirements contracts, it had ample opportunity to include essential terms specifying as much, but it did not do so. The court will

not rewrite the Agreements to deny Ingram Barge the benefit of its bargain, particularly where the parties stated that each Agreement "sets forth *the entire understanding between the parties hereto*." (Agreements Part II, ¶ 55.G (emphasis added)).

Furthermore, the parties *did* include a contractual term that would have excused either party from performing, in the case of *force majeure* only. (*See* Agreements, Part II ¶ 45.) These circumstances included, *inter alia*, acts of God and fires, explosions, and floods. Thus, had the smelter shut down due to a fire, explosion, or flood, Century would have been excused from performing under the Agreements. However, the Agreements do not contain any provision exempting Century from performing based on general economic conditions, Century's production "needs" or "requirements" at the smelter, or, as turned out to be the case, Century's business decision to shut down the smelter. Pursuant to the doctrine of *expressio unius est exclusio alterius*, the inclusion of ¶ 45 in each Agreement and the lack of any comparable exemption from performance related to economic conditions, Century's production needs, or its business judgment reinforce the court's interpretation. *See D&E Constr., Inc. v. Robert J. Daley Co., Inc.*, 38 S.W.3d 513, 519 (Tenn. 2001); *S.M.R. Enterps., Inc. v. S. Haircutters, Inc.*, 662 S.W.2d 944, 949 (Tenn. App. 1983)

2.    Whether the Requirements Contracts are Enforceable

The court is not persuaded by Century's arguments that construing the Agreements as bilateral contracts with a guaranteed volume renders them unenforceable.

The contracts provided for adequate consideration, binding Ingram Barge to, *inter alia*,

have available certain numbers and types of barges for the shipments, maintain cargo insurance at its own expense, absorb a certain measure of cleaning costs, carry the alumina and coke only in ratable and approximately equal installments, and indemnify Century against any losses due to Ingram Barge's negligent or willful misconduct. *See Calabro v. Calabro*, 15 S.W.3d 873, 877 (Tenn. Ct. App. 1999) (quoting *Kozy v. Werle*, 902 S.W.3d 404, 411 (Tenn. Ct. App. 1995) ("Consideration consists when the promisee does something that he is under no legal obligation to do or refrains from doing [that] which he has a legal right to do.")); *Wil-Helm Agency v. Lynn*, 618 S.W.2d 748, 751 (Tenn. Ct. App. 1981) (parties can enter into bilateral contracts, "wherein each party [is] obligated to the other to render certain performances, the carrying out of which by each party was essential to the realization of benefits under the contract[s].")  The fact that Century agreed to pay Ingram Barge at the point of origin, where each barge was loaded – before any product had actually been shipped to its destination – did not relieve Century of its obligation to ship the product, which the remainder of the Agreements plainly contemplated.

Century argues that the existence of varying rates listed in the Appendices demonstrates that there was no meeting of the minds on a price term, because the total contract price could have varied based on the actual routes along which Ingram Barge transported the alumina and coke.  However, the contracts specified "primary" and "alternative" routes, suggesting that Ingram Barge's initial obligation was to ship along a primary route – which, in practice, it did – utilizing alternative routes only as necessary.  Whether it was a wise business decision for Century to agree to a contract with Ingram Barge that did not impose a specific quantity

limitation on any particular route is not relevant to the court's interpretation of the contractual terms.[12]

Century also suggests that it was not aware of the terms of Agreements when they were signed, particularly certain alleged "form" terms in Part II of each Agreement. This argument is entirely unpersuasive: the Agreements were the result of bilateral negotiations with the assistance of counsel, and Century's representative signed or initialed every page of both Agreements and the Appendices, reflecting Century's explicit assent to the terms contained therein, which the court is obligated to enforce.[13]

## III. Ingram Barge's Breach of Contract Claim

### A. Elements

Under Tennessee law, the essential elements of a breach of contract claim include "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the

---

[12]Furthermore, Century's position regarding whether the rate terms are enforceable would seem to apply with equal force to the Agreements regardless of whether or not they are construed as requirements contracts. Century paradoxically argues that there was a meeting of the minds on the rates and associated routes only if the Agreements are construed as requirements contracts. However, it is unclear to the court why the rates listed in the Appendices would be enforceable in one context but unenforceable in the other.

[13]Ingram Barge has cited to testimony from Century's representative, Scott States, concerning Century's contractual relationships with other companies, some of which may have involved explicit "requirements contracts." Ingram Barge relies on this evidence to demonstrate that Century was aware of how to form a requirements contract using appropriate language, but chose not to do so here with respect to the Agreements. Century argues that Scott's testimony in this regard is irrelevant and otherwise inadmissible on a number of grounds. Because the court has found that, even without reference to that testimony, the Agreements are not requirements contracts, the court need not resolve whether the testimony is relevant and/or admissible.

contract, and (3) damages caused by the breach of the contract." *ARC LifeMed, Inc. v. AMC-Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005) (citation omitted). The court has already found that there was an enforceable contract between Ingram Barge and Century. Thus, by failing to ship the requisite tonnages of alumina and coke in 2009 and 2010, Century breached the Agreements. The only remaining consideration is damages, which the parties dispute.

### B. Damages

Ingram Barge seeks to recover its expectation damages in the form of lost profits. *Waggoner Motors, Inc. v. Waverly Church of Christ*, 159 S.W.3d 42, 47 (Tenn. Ct. App. 2005), *perm . app. denied*, Feb. 28, 2005 (expectation damages "restore the injured party, as nearly as possible, to the position it would have been in had the wrongful conduct not occurred."). "[A]n injured party may recover lost anticipated profits when their nature and occurrence have been established with reasonable certainty." *Id.* at 58 (citing *Baker v. Hooper*, 50 S.W.3d 463, 470 (Tenn. Ct. App. 2001); *Tire Shredders, Inc. v. ERM-N. Cent., Inc.*, 15 S.W.3d 849, 857 (Tenn. Ct. App. 1999); 1 Recovery of Damages For Lost Profits § 1.4, at 9). *Waggoner* sets forth the standards for demonstrating the requisite "reasonable certainty":

> The reasonable certainty standard applies chiefly to the evidence regarding *the existence* of damages. It is a flexible standard that permits the courts to take the particular facts of each case into consideration. The existence of damages has been proven with reasonable certainty when the mind of a prudently impartial person is satisfied that the injured party has been damaged.
>
> *Once an injured party proves that it has been damaged, the amount of damages need not be proved with certainty or mathematical precision.* After the fact of damages ha[s] been established, less certainty is required with regard to the amount of the damages. *The amount of lost profits damages may be based on*

*estimates*.  While definite proof regarding the amount of damages is desirable as far as it is reasonably possible, *it is even more desirable that an injured party not be deprived of compensation merely because it cannot prove the extent of the harm suffered with complete certainty* . . . .

An award for lost profits damages depends on whether the evidence provides a satisfactory basis for estimating what the injured party's probable earnings would have been had the wrongdoing not occurred.  Since lost profits can rarely be computed down to the last penny, the evidence needed to support an award for lost profits need only provide a reasonable or rational basis for calculating what the lost profits would have been.

159 S.W.3d at 58 (internal citations and quotations omitted); *see also Stewart Title Co. Of Memphis v. First Am. Title Ins. Co.*, 44 F. Supp. 2d 942, 956 (W.D. Tenn. 1999) ("Lost profits may be recovered following a breach of contract, so long as the existence of lost profits is not remote, uncertain, or speculative.")

Damages for lost profits are based on net profits, not gross profits.  *Waggoner*, 159 S.W.3d at 59 (citing *First Tenn. Nat'l Bank Ass'n v. Hurd Lock & Mfg. Co.*, No. 117, 1988 WL 86493, at *3 (Tenn. Ct. App. Aug. 19, 1988), *per app. denied* (Tenn. Oct. 31, 1988)).  Net profits reflect gross profits minus the costs necessary to achieve those gross profits.  *Id.*; *see also Phillips Contractor's & Mgmt., LLC v. Stealth Grp., LLC*, No. E2006-01960-COA-R3-CV, 2007 WL 1373189, at *2 (Tenn. Ct. App. May 10, 2007).  According to *Waggoner*:

Anticipated future profits may be reasonably ascertained from the past volume of the injured party's business and from other provable data relevant to probable future sales. The best evidence of lost profits is a comparison of the experience of the injured party's own business before and after the wrongdoing.

159 S.W.2d at 59.

Century contends that Ingram Barge's theory of damages is entirely speculative and,

therefore, fails to establish its lost profits with the requisite certainty. Century posits several arguments in support of this contention: (1) because Ingram Barge was not obligated to ship a specific amount over any particular route, its damages could have ranged from $7.88 to $35.95 per ton under the Alumina Agreement and from $6.16 to $16.89 per ton under the Coke Agreement; (2) Ingram Barge's damages model assumes that it would have experienced the same operating margins from April 2009 through December 31, 2010, even though its system-wide operating margins varied considerably during that time frame; (3) Ingram Barge suffered a significant system-wide loss of revenues in 2009, which would have downwardly affected its operating margins on the shipments subject to the Agreements; (4) during the course of this case, Ingram Barge revised its damages calculation downward by approximately $500,000; (5) Ingram Barge's damages calculation is based on projected rates per ton that (marginally) exceed its actual rates per ton through April 2009; and (6) with respect to roll covered barges, which Ingram Barge had utilized to carry alumina under the Alumina Agreement in 2007 and 2008, Ingram Barge actually earned a higher operating margin per barge in 2009 system-wide and earned much higher revenues system-wide than expected in 2010.

Whatever the relative merits of these theories, they bear on the appropriate measure of Ingram Barge's damages, not their existence. Because of Century's breach, Ingram Barge was not able to ship several hundred thousand tons of alumina and coke over a nearly two-year period, on which Ingram Barge would have received some profit margin. Although Century is correct that Ingram Barge could have shipped the alumina and coke over a number of different

routes – each of which has an associated freight rate that varied substantially from route to route – and that multiple factors would have influenced which routes Ingram Barge would actually have taken had the loads been shipped, those facts do not preclude Ingram Barge from recovering a reasonable estimate of the profits it lost from Century's breach.

Indeed, Ingram Barge has attempted to calculate its damages based on its actual past performance under the Agreements: for example, to calculate projected revenues, it utilized a weighted average of the rates it actually charged through 2009 as a proxy for the rates it would have charged in the remainder of 2009 and 2010. It then estimated the costs that it would have incurred to achieve those revenues and subtracted that figure from its estimated revenues. The basic premise of this damages estimate comports with the Tennessee standard articulated in *Waggoner*.

The court is unpersuaded by Century's argument that system-wide data, standing alone, demonstrates that Ingram Barge suffered *no* damages. For example, the fact that Ingram Barge maintained a successful roll covered barge business in 2009 and 2010 *system-wide* does not demonstrate that Ingram Barge would not have earned *any* additional profit margin had Century shipped the remaining tonnages of alumina (over 600,000 tons) during those two years. The record before the court does not contain any evidence that Ingram Barge was actually able to replace all of the lost volume from Century's breach in its roll-top barges sector.[14] Furthermore,

---

[14]To the contrary, a witness from Ingram Barge testified that Ingram Barge in fact was *not* able to the replace at least some of the lost volume in 2009. (Docket No. 74, Ex. 3, Daniel Martin Dep. at 172:4-22 ("[T]he market simply wasn't there for northbound cargos during 2009 . . . . We simply couldn't find replacement cargo.")

as Ingram Barge points out, the Amendments to the Alumina Agreement permitted Ingram Barge to utilize lift covered barges; thus, even if it were the case that Ingram Barge had replaced all of the lost volume on the roll covered barges at rates at or higher than those under the Alumina Agreement, Ingram Barge perhaps could have used lift covered barges to complete its shipping obligations under the Alumina Agreement, thereby accruing additional net profits.

At any rate, even if Ingram Barge's estimates contain some potentially flawed assumptions or miscalculations that may merit a downward adjustment thereof, Ingram Barge has sufficiently demonstrated to a reasonable certainty that it actually suffered some damages, thereby satisfying the damages element for liability purposes. *See Waggoner*, 159 S.W.3d at 58. Indeed, Ingram Barge is not required to prove the amount of its lost profits with "mathematical precision," and Tennessee specifically permits the use of estimates to calculate lost profits. *Id.*[15]

To the extent that Ingram Barge's damages model does contain some flawed assumptions or miscalculations, Century will have the opportunity to raise those concerns to the Magistrate Judge, who will make downward adjustments to the damages award, if appropriate.

Accordingly, the court finds that Century is liable to Ingram Barge under the Agreements for an amount to be determined. The matter will be referred to the Magistrate Judge for a hearing to determine the appropriate measure of Ingram Barge's damages.

## IV.    Motion to Strike

---

[15]The fact that Ingram Barge self-corrected its damages calculation in the course of this case does not establish that Ingram Barge suffered no damages in the first place. Even after the downward adjustment, Ingram Barge still estimates that it suffered nearly *$5 million* in lost profits, not including prejudgment interest.

Century has moved to strike the Conatser Affidavit, contending that it impermissibly conflicts with her prior deposition testimony and that she lacks personal knowledge of its substance, in violation of Fed. R. Civ. 56(c)(4).  *See also Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906-907 (6th Cir. 2006).  Conatser had calculated the original damages estimate ("Original Damages Calculation") and a revised estimate ("Revised Damages Calculation").  Her affidavit appears designed to address Century's argument, stated in support of its Motion for Summary Judgment, that the court should disregard Ingram Barge's damages calculations entirely because the corrections were unjustified.  In particular, the affidavit attempts to explain the downward revision of Ingram Barge's damages calculations to reflect the exclusion of certain 2009 loads.

In the course of her brief deposition in January 2011, Conatser had testified that she did not know "why" she had revised the Original Damages Calculation to exclude certain "volumes."  (Docket No. 81, Ex. 2, Conatser Dep. at 10:11-10:25.)  Counsel for Century did not ask any follow-up questions.  Here, in ¶¶ 5-6 of her affidavit, Conatser now provides information purporting to explain the basis for excluding certain tonnages when she prepared the Revised Damages Calculation.  On the existing record, it is unclear to the court whether this information supplements or contradicts her prior deposition testimony.[16]

At any rate, the court has resolved the Motion for Summary Judgment and the Cross-Motion for Summary Judgment without considering the Conatser Affidavit.  The subject matter

---

[16]For instance, it may be that, after making the calculation, Conatser learned why it had been made.

of the Conatser Affidavit may be addressed at the damages hearing.[17]

## **CONCLUSION**

For the reasons stated herein, Century's Motion for Summary Judgment will be denied, and Ingram Barge's Cross-Motion for Summary Judgment will be granted, subject to a determination of Ingram Barge's damages. Century's Motion to Strike the Conatser Affidavit, which the court has not considered with respect to the dispositive motions, will be denied.

This case will be referred to the Magistrate Judge for a damages hearing to determine the appropriate measure of Ingram Barge's damages.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

---

[17]The Conatser affidavit will remain in the record. The substance of her prior deposition testimony and the affidavit – and any inconsistencies that Century perceives between them – will be appropriate subjects for further inquiry at the damages hearing. If Century believes that, in advance of the damages hearing, it requires further deposition testimony from Conatser or another appropriately knowledgeable witness regarding her affidavit and/or the subject matter addressed therein, it may file a motion for such relief for the court's consideration.